# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7730 | **DATE** | 1/31/2003 |
| **CASE TITLE** | Wendt vs. Village of Evergreen Park | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. the court grants Evergreen Park's motion for summary judgment [#20]. The court does, however, also grant Wendt's motion for leave to file an amended complaint [#36]. Wendt is granted leave to file an amended complaint by March 3, 2003 based on actions that took place after his motion for summary judgment was filed and that are covered in his August 16, 2002 right to sue letter from the EEOC. The clerk is instructed to enter judgment in favor of Evergreen Park on Counts I, II, III, IV, and V of Wendt's Complaint. Status hearing is set for 4/8/03 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | number of notices: 4 | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | FEB 0 3 2003 date docketed | 38 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 1/31/2003 date mailed notice | |
| MD | courtroom deputy's initials | 03 JAN 31 PM 1:09 Date/time received in central Clerk's Office | MD mailing deputy initials | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WINFIELD WENDT,   )
                  )
    Plaintiff,    )
                  )
        vs.       )   No. 00 C 7730
                  )   Judge Joan H. Lefkow
VILLAGE OF EVERGREEN PARK,   )
                  )
    Defendant.    )
                  )

DOCKETED
FEB 0 3 2003

## MEMORANDUM OPINION AND ORDER

In this action filed by plaintiff, Winfield Wendt ("Wendt"), alleging discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12102 *et seq.* (Count I), retaliation under the ADA (Count II), violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 630 (Count III), retaliation under the ADEA (Count IV), and violations of First Amendment rights pursuant to 42 U.S.C. § 1983 (Count V), defendant, Village of Evergreen Park ("Evergreen Park"), has moved under Rule 56, Fed. R. Civ. P., for summary judgment as to all of Wendt's claims. For the reasons set forth below, the court grants the motion.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The

party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF

Evergreen Park is a municipal corporation under Illinois law. (Def. L.R. 56.1 ¶ 2.) Wendt is a lieutenant with Evergreen Park's Police Department ("EPPD"). (Def. L.R. 56.1 ¶ 3.) Wendt began employment with Evergreen Park in 1967, working his way up to the position of sergeant in 1977 and patrol lieutenant in 1988, where he currently serves. (Def. L.R. 56.1 ¶¶ 6-8.) In 1990, Wendt applied for the position of lieutenant in charge of the EPPD detective unit, but another officer was appointed to the position.[1] (Def. L.R. 56.1 ¶ 9.) In 1995 Wendt applied for the position once more but was again denied. (Def. L.R. 56.1 ¶ 10.)

Police officers at the EPPD work three different eight hour shifts: days (8:00 a.m. to 4:00 p.m.), afternoons (4:00 p.m. to midnight) and midnights (midnight to 8:00 a.m.). While working

---

[1] The detective lieutenant position holds an equal rank to all other lieutenants in the department and earns the same level of pay. The position does, however, allow for a cash clothing allowance because the detective lieutenant works in plain clothes. (Def. L.R. 56.1 ¶ 11.)

2

as a patrol officer, Wendt's shift rotated every 28 days. (Def. L.R. 56.1 ¶ 12.) When Wendt was promoted to sergeant, he also worked each of the shifts on a rotating basis. (*Id.*) While Wendt was a sergeant of support services, however, Wendt worked a straight day shift. (*Id.*) As a sergeant in the detective section, Wendt rotated between the day and the afternoon shift. (*Id.*) As a patrol lieutenant, Wendt rotated through all three shifts. (*Id.*)

In 1999, the EPPD had seven lieutenants. (Def. L.R. 56.1 ¶ 13.) Three of the lieutenants worked in the patrol division, while one lieutenant supervised the patrol function on each shift. When EPPD Lieutenant John Brines retired, the Village Board made a preliminary decision not to fill the vacate lieutenant position. (Def. L.R. 56.1 ¶ 14.) At the end of April 1999, a petition was distributed through the EPPD concerning the Village Board's decision. (Def. L.R. 56.1 ¶ 15.) The petition, signed by forty-three EPPD police officers including Wendt, claimed that the public safety was being jeopardized by the vacancy.[2] (*Id.*) Wendt claims to have written the letter and played a key part in its circulation within the EPPD. (Def. L.R. 56.1 ¶ 16.) The petition was delivered to the Village President by EPPD Sgt. Jim Sirokey ("Sirokey"). (*Id.*)

---

[2]The petition stated as follows:

Dear Mayor Vacco

We the undersigned, feel that the Village of Evergreen Park is taking undue risk with the lives of the Police personnel of this Village. By placing the current heavy work load on the employees, which includes unprecedented cuts in overtime, jury rigging the minimum man power standards as well as refusing to hire people to cover the vacated positions, the Village is promoting unsafe conditions for its police officers as well as its citizens.

We don't think this is prudent or in the best interest of the citizens of this Village. It places the Police officers at great risk which is not to the officers, their families or the residents of Evergreen Park. Any monetary savings incurred would be greatly overshadowed by the liability brought about.

We therefore petition the Village to reinstate the Police Department to its former strength, augmented by overtime as was done in the past and fill the vacated positions that the citizens and officers deserve.

(Def. L.R. 56.1 ¶ 15.)

3

In response to the petition, the Village President, Anthony Vacco, told EPPD Police Chief Thomas Evoy ("Chief Evoy") to survey surrounding communities to determine whether the EPPD was understaffed with supervisory level employees. (Def. L.R. 56.1 ¶ 18.) The survey concluded that the EPPD's supervision equaled or surpassed surrounding communities. (Def. L.R. 56.1 ¶ 19.) Thus, the Village President and Board directed Chief Evoy to operate without promoting an additional lieutenant. (Def. L.R. 56.1 ¶ 19.) Chief Evoy then devised a plan that involved using EPPD Deputy Chief Kenneth Klumhaus ("Klumhaus"), who worked a straight non-rotating day shift, to serve as the lieutenant in charge of patrol operations for the day shift. (Def. L.R. 56.1 ¶ 20.) Chief Evoy then assigned Detective Karkoska ("Karkoska"), who had severe heart problems and had recently had open-heart surgery, to serve as the patrol lieutenant on the afternoon shift, on a non-rotating basis. (*Id.*) Wendt was assigned to work as the patrol lieutenant on the midnight shift on a non-rotating basis. (*Id.*) Wendt was notified on May 21, 1999, that he would begin working the midnight shift on June 3, 1999. (Def. L.R. 56.1 ¶ 23.)

On April 1, 1999, effective May 1, 1999, Chief Evoy gave Wendt a raise that was approximately $85.00 per pay period less than the next lowest raise given to lieutenants. (Def. L.R. 56.1 ¶ 35.) EPPD lieutenants receive a merit increase that is determined by the Police Chief. The Village Board authorizes a lump sum of money to the Chief, who then, based on evaluations performed by the Deputy Chiefs, and any other factors the Chief finds applicable, allots the money between the lieutenants. (Def. L.R. 56.1 ¶ 34.) Evergreen Park maintains that Wendt was given the lowest raise because Chief Evoy was angry with Wendt for having placed a tow ticket on the car of Norbert Smith, a Village Trustee, with whom Evergreen Park believes

4

Wendt had a long running feud. (Def. L.R. 56.1 ¶¶ 36-37.) Wendt believes he was given the lower raise because of his participation in the April 1999 petition and/or his ADA request. (Pl. Resp. to Def. L.R. 56.1 ¶ 36.)

After receiving the assignment to the midnight shift, Wendt notified Chief Evoy that he suffered from sleep apnea[3] and could not work a permanent midnight shift. (Def. L.R. 56.1 ¶ 24.) Wendt was first diagnosed with sleep apnea in 1993 by Dr. Richard Kern ("Dr. Kern"). (Def. L.R. 56.1 ¶ 25.) Dr. Kern treated Wendt by advising use of a Constant Positive Air Pressure ("CPAP") device, which forced air into a tube that hooked into a mask which Wendt placed over his face while sleeping. (Def. L.R. 56.1 ¶ 26.) Wendt described the CPAP device as being effective 80% of the time in correcting his sleep breathing, but difficulties in the device sometimes occurred when particular sleep positions caused the mask to become dislodged from its place during sleep. (*Id.*)

On June 11, 1999, Wendt produced a letter from Dr. Kern to Chief Evoy, which stated as follows,

> Officer Wendt was diagnosed with a sleep disorder called obstructive sleep apnea in 1993. This disorder is characterized by loud snoring, disruptive sleep due to repeated episodes of breathing cessation, and excessive daytime sleepiness. His sleep apnea has been well controlled by using a device called nasal CPAP. Because of this sleep disorder, he has difficulty sleeping and maintaining alertness when working in the swing and midnight shifts. He functions very well working the day shift. The night shift posses [sic] great difficulty and is not compatible with his maintaining proper alertness during work hours. The day shift would be optimal. Please contact me if you require further information.

---

[3]Sleep apnea is the "transient cessation of breathing during sleep." *Rapoport v. Dement*, 254 F.3d 1053, 1054 (Fed. Cir. 2001). Obstructive sleep apnea, which Wendt was diagnosed with, is characterized by the "sporadic recurring collapse of the patient's upper airway ... during sleep. If the collapse is complete, there is no air exchange at the nose and mouth and breathing is interrupted. The usual result is a partial arousal and a return to normal breathing." *Id.*

5

(Def. L.R. 56.1 ¶ 28.)

Following this letter, Evergreen Park requested another examination of Wendt. On August 23, 1999, Dr. Jean-Paul Spire examined Wendt and sent Chief Evoy a letter stating,

> Officer Wendt was seen today in the sleep disorder center in company of my associate and fellow, Dr. Idress Zahoor, with regard to a second opinion, at your request, concerning a long standing sleep disorder situation in this gentleman since 1993. He bears an established diagnosis of obstructive sleep apnea, correctable with CPAP equipment, and this permits him to have at least no further difficulties with his daytime somnolence or vigilance.
>
> I note, in the file submitted, a letter from Dr. Richard Kern, Clinical Director at Little Company of Mary of the Sleep Disorders Group, and his recommendation that Officer Wendt would benefit from being on a stable day/night cycle.
>
> As a general rule, I am entirely in concert with Dr. Kern's opinion. Sleep disorders such as sleep apnea are severe and certainly a normal waking sleep schedule is of utmost concern for a patient with this diagnosis. It would be, therefore, preferable that Officer Wendt be afforded a regular schedule of daytime work and nocturnal sleep.

(Def. L.R. 56.1 ¶ 29.)

On September 13, 1999, in response to a follow-up question from Chief Evoy, Dr. Spire sent Chief Evoy a letter stating,

> To make myself perfectly clear, Lieutenant Wendt's condition, while correctable with CPAP, would apparently make it moot whether it was performed during the day if he was working on a midnight shift or during the night if he was working on days. This is absolutely correct. At issue, however, is the general recommendation for patients with sleep disorders that the essence of proper sleep hygiene is to have a normal diurnal rhythm, that is, working days and sleeping at night. Moreover, shift workers have, of course, the problem of being always out of phase with the rest of the world when they are not at work so that their sleep is somewhat fractured on weekends or holidays, since they will, perforce, attempt to spend as much as time as possible with family and friends who are diurnal creatures, unless everybody else was on night shift. It is because of this adjustment that is required of shift workers that makes this recommendation in somebody with a sleep disorder so important.

> Nevertheless, your remark is absolutely appropriate. In other individuals who are able to accomplish night shift work and have no sleep disorder, they are able to acclimatize themselves reasonably well, albeit with some difficulty nevertheless. In Lieutenant Wendt's case, he has had a chronic sleep disorder which I believe night shift would aggravate unnecessarily.

(Def. L.R. 56.1 ¶ 30.)

On October 15, 1999, Dr. Kern sent another letter to Chief Evoy stating,

> I am writing to clarify my position regarding Mr. Wendt's sleep disorder and his function at work. Mr. Wendt has a sleep disorder, obstructive sleep apnea, characterized by excessive daytime sleepiness during waking hours. Mr. Wendt's sleep apnea can be controlled by nasal CPAP therapy. However, it is generally recommended that all patients with sleep disorders practice routines that optimize both sleep and waking function. These include following a schedule in which the patient sleeps during the night and is awake during the day, because waking function as well as sleep continuity is generally impaired in night shift workers. Since Mr. Wendt already has a sleep disorder, working the day shift is strongly recommended. This general recommendation is true of all patients with sleep disorders. I believe that his working the night shift will negatively affect both his sleep quality and waking function, and aggravate his sleep apnea.

(Def. L.R. 56.1 ¶ 31.) Wendt worked the midnight shift until September 2000, when he was assigned to a different shift. (Def. L.R. 56.1 ¶ 32.) Wendt has not been assigned permanently to work the midnight shift since then. (*Id.*)

Wendt filed his charge of ADA and ADEA discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 5, 1999. (Def. L.R. 56.1 ¶ 40.) In September 2000, Chief Evoy retired and Michael Saunders ("Saunders"), the EPPD's detective lieutenant, was appointed Police Chief. (Def. L.R. 56.1 ¶ 38.) Saunders appointed Sirokey as the detective lieutenant because he believed that Sirokey was more qualified for the job as compared to Wendt. (Def. L.R. 56.1 ¶ 39.)

7

## DISCUSSION

In Count I, Wendt alleges that Evergreen Park violated the ADA by failing to reasonably accommodate his sleep apnea. In Count II, Wendt alleges that Evergreen Park retaliated against him by giving him a smaller pay increase than other lieutenants and by denying him a promotion because Wendt filed a charge with the EEOC. In Count III, Wendt alleges that Evergreen Park violated the ADEA because the smaller pay increase and denial of promotion were based on Wendt's age. In Count IV, Wendt alleges that the smaller pay increase and denial of promotion were in retaliation for his EEOC Charge, which also complained of age discrimination. In Count V, Wendt alleges, pursuant to 42 U.S.C. § 1983, that Evergreen Park transferred him to the midnight shift, denied him a promotion and gave him a lower pay increase in retaliation for the exercise of his First Amendment rights in circulating the petition in April 1999.

### A.  Count I: ADA Claims

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001). In addition, "[t]he Act also provides that an employee discriminates against a qualified individual with a disability by 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 563 (7th Cir. 2000), quoting 42 U.S.C. § 12112(b)(5)(A).

To establish a *prima facie* case of discrimination, Wendt must show that (1) he is disabled within the meaning of the ADA, (2) he is qualified to perform the essential functions of

8

his job either with or without reasonable accommodation, and (3) he has suffered from an adverse employment decision because of his disability. *Dvorak v. Mostardi Platt Assoc., Inc.*, 289 F.3d 479, 483 (7th Cir. 2002); *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 669-70 (7th Cir. 2000). Evergreen Park argues that Wendt cannot establish his *prima facie* case of an ADA violation because his sleep apnea does not qualify as an ADA "disability" and he cannot show that he suffered an adverse employment action.

Under the ADA, a disability is either (a) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (b) a record of such impairment; and (c) being regarded as having such an impairment. 42 U.S.C. § 12102(2). Therefore, to prove that he has a disability, under (a) on which he relies, Wendt must show: (1) he suffers from an impairment; (2) the impairment affects major life activities; and (3) the impairment "substantially limits" such major life activities. *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998); *Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship*, 209 F.3d 678, 683 (7th Cir. 2000).

The parties do not dispute that Wendt's sleep apnea constitutes an impairment. Thus, Wendt must show that his impairment substantially limits a major life activity. A major life activity is an activity of central importance to daily life. *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, –, 122 S.Ct. 681, 691 (2002). ADA regulations provide the following representative list of major life activities: caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, learning and working. 29 C.F.R. § 1630.2(i). Wendt focuses on breathing and sleeping as major life activities. Breathing is expressly listed in the representative list, while sleep is not. Nevertheless, this court agrees with other courts that have found that sleep is a major life activity. *E.g., Silk v. City of Chicago*, No. 95 C 0143, 1997 WL 790598, at

9

*7 (N.D. Ill. Dec. 17, 1997) ("This court, however, finds that sleep is a 'major life activity.' Sleep is a basic function that humans do as part of their daily life."); *see also*, *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999); *Kolecyck v. MCI Worldcom, Inc.*, No. 00 CV 8414, 2001 WL 245531, at *9 (N.D. Ill. March 12, 2001); *Mont-Ros v. City of West Miami*, 111 F. Supp. 2d 1338, 1354-55 (S.D. Fla. 2000).

As Wendt has presented evidence of an impairment that affects a major life activity, the court looks to see if Wendt has passed the next hurdle, whether he is "substantially limited" in the major life activities of breathing and sleeping. The term "substantially limited" means

> Unable to perform a major life activity that the average person in the general population can perform; or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(i). Factors to be considered in determining whether an individual is substantially limited in a major life activity include (i) the nature and severity of the impairment; (ii) the expected duration of the impairment; and (iii) the permanent or long term impact resulting from the impairment. 29 C.F.R. § 1630.2(j)(2)(i)-(iii).

Evergreen Park argues that no substantial limitation on either sleeping or breathing exists because Wendt admits that his usage of the CPAP device corrects his impairment up to 80% of the time. Evergreen Park relies on *Sutton v. United Airlines*, 527 U.S. 471 (1999), where the Court explained,

> Looking at the Act as a whole, it is apparent that if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures–both positive and negative–must be taken into account when judging whether that person is "substantially limited" in a major life activity and thus "disabled" under the Act.

10

*Id.* at 482.

Evergreen Park also points to the medical reports from Drs. Kern and Spire as further proof that Wendt's ability to breath or sleep is not substantially impaired. Dr. Kern stated that Wendt's "sleep apnea *has been well controlled* by using a device called nasal CPAP." (Def. L.R. 56.1 ¶ 28.) (Emphasis added). Dr. Kern later stated that "Mr. Wendt's sleep apnea *can be controlled* by nasal CPAP therapy." (Def. L.R. 56.1 ¶ 31.) (Emphasis Added). Dr. Spire stated that Wendt "bears an established diagnosis of obstructive sleep apnea, *correctable* with CPAP equipment, and this permits him to have at least no further difficulties with his daytime somnolence or vigilance." (Def. L.R. 56.1 ¶ 29.) (Emphasis Added). Moreover, Dr. Spire later reaffirmed that Wendt's condition *"while correctable* with CPAP, would apparently make it moot whether it was performed during the day if he was working on a midnight shift or during the night if was working on days." (Def. L.R. 56.1 ¶ 30.) (Emphasis added).

Wendt, in response to this evidence, argues that his 80% normal condition combined with his transfer to a permanent midnight shift constitutes a disability within the meaning of the ADA. Wendt's argument, however, is flawed on several grounds. First, Wendt presents no evidence that his breathing or sleeping were substantially impaired after his transfer to the midnight shift. While his doctors stated a transfer to the nighttime shift *would* "aggravate unnecessarily" Wendt's disorder and "negatively affect both his sleep quality and waking function, and aggravate his sleep apnea" no conclusive finding as to whether the sleep apnea actually did unduly affect his sleep/waking function is presented. Indeed, the reports appear more geared toward general recommendations, not Wendt's specific situation.

11

Moreover, Wendt was working a rotating shift that included a midnight shift (for a 28 day stint every third month) prior to his permanent midnight shift. Wendt never claimed that he was disabled during this rotating schedule. Simply put, Wendt has presented no evidence that his sleeping or breathing function is inhibited to a sufficient degree for him to be "substantially impaired," even when Wendt worked at the night shift.

In *Silk*, the court found a question of fact with respect to whether a police officer who suffered from sleep apnea had a disability. 1997 WL 790598, at *8. Addressing the issue of whether plaintiff was substantially limited in the major life activities of breathing and sleeping, the court noted that even when the plaintiff worked a steady afternoon shift the evidence showed that his sleep apnea caused his oxygen saturation level to be only borderline, his blood pressure would rise when he was sleeping, and that his sleep specialist had testified that he does not get a sufficient amount of sleep, particularly quality sleep, even when he worked a steady daytime shift as a police officer. *Id.* at *7. The court found this evidence sufficient to create an issue of fact as to whether plaintiff was substantial limited in the activities of sleeping and breathing. *Id.* at *8. Wendt points to no such evidence in this case. In fact, with the exception of generalized recommendations from doctors of how it is "better" for someone suffering from sleep apnea to work a daytime shift–which certainly does not translate into a substantial limitation–Wendt presents no evidence as to how his breathing and sleeping are substantially limited. As such, Wendt has failed to illustrate that he suffers from a disability, and failed in his *prima facie* case under the ADA. Judgment is entered in favor of Evergreen Park on the Count I ADA claims.

**B.  Counts II, III, and IV**

Wendt presents no response to Evergreen Park's charges that summary judgment is

12

appropriate on the Count II retaliation claim under the ADA, the Count III claim under ADEA, and the Count IV retaliation claim under ADEA. While it is not entirely clear whether a party can waive a claim presented in its complaint by failing to argue the matter in response to a motion for summary judgment, *compare Nabozny* v. *Podlesny*, 92 F.3d 446, 457 n.9 (7th Cir. 1996) (non-moving party's failure to raise an issue in response to summary judgment motion does not result in waiver), *with Berry* v. *Delta Airlines, Inc.*, 260 F.3d 803, 810 (7th Cir. 2001) (non-moving party's failure to raise issue in response resulted in waiver), the court believes Wendt has waived any argument on these Counts. *E.g., Warren* v. *Hotel-Inter Cont'l Chicago*, No. 01 C 04370, 2003 WL 41984, at *6 (N.D. Ill. Jan. 6, 2003) ("In her opposition brief to summary judgment, [plaintiff] makes no attempt to contest Inter-Continental's argument that it satisfied both prongs of his defense. Thus, [plaintiff] has waived any argument in opposition."); *Blakely* v. *Brach & Brock Confections*, 181 F. Supp. 2d 943, 951 (N.D. Ill. 2002) ("[Plaintiff] does not respond, so he has waived any argument in opposition.").

This is not a situation where a plaintiff did not respond because the matter pled in the complaint was not raised in the defendant's motion for summary judgment. *See Childs* v. *Earle M. Jorgensen Co.*, No. 00 C 5853, 2001 WL 1607565, at *2 (N.D. Ill. Dec. 17, 2001). Nor is this a situation where no responsive pleading at all was filed. *See, e.g.*, Local Rule 78.3 ("Failure to file a supporting memorandum shall not be deemed to be a waiver or a withdrawal of opposition thereto...."); *Hampton* v. *LSX Delivery, L.L.C.*, No. 00 6690, 2002 WL 31399412 (N.D. Ill. Oct. 23, 2002). Instead, Wendt has chosen to limit his response to only some of the claims that Evergreen Park has raised in its motion for summary judgment. The court views those claims not responded to as reflecting a choice to waive them.

13

Even, however, construing the record as it stands without a response from Wendt, the court concludes that no genuine issue of material fact exists for trial on these Counts. With respect to the Count II retaliation claim, Wendt claims that his smaller raise and failure to get promoted were both in retaliation for Wendt filing a charge of ADA and age discrimination with the EEOC. The decision concerning the raise, however, was made in April 1999, while Wendt filed his EEOC charge in August 1999. Thus, because the lower pay increase preceded the EEOC charge, clearly the lower pay increase could not be retaliation for the EEOC filing. Moreover, with respect to Wendt's failure to get promoted, Wendt presents no evidence that this decision made in September 2000 was in retaliation for the EEOC charge well over a year earlier. Wendt had twice before been passed over for the same detective lieutenant position, and the undisputed testimony was that Saunders believed Sirokey was the most qualified for the position. Finally, reaching Wendt's age discrimination claims, Wendt presents no evidence in the record that the lower pay raise or not getting the detective lieutenant assignment were based on his age. Therefore, judgment is entered in favor of Evergreen Park on Counts II, III and IV.

### C. Count V: Section 1983 Claim

In Count V, Wendt seeks recovery under 42 U.S.C. § 1983, alleging violations of his First Amendment rights. Wendt alleges that Evergreen Park retaliated against him for exercising his First Amendment rights when he complained in a petition, signed by EPPD officers and given to Evergreen Park's President, about the Village refusing to fill a vacant lieutenant's position. Wendt claims that Evergreen Park retaliated against him by placing him on the midnight shift, giving him a lower pay raise and denying him the position of detective lieutenant.

Without reaching Evergreen Park's other arguments in favor of dismissing this Count,

14

namely that the statement was not protected by the First Amendment, that there is no evidence that the actions were motivated by the statement, and Wendt did not suffer an adverse employment action, the court concludes that judgment should be entered in favor of Evergreen Park because, based on case law establishing standards for municipal liability under § 1983, no genuine issue of material fact exists to hold Evergreen Park liable under § 1983.

A municipality may be held liable under § 1983 in one of three ways:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Baxter* v. *Vigo County Sch. Corp.*, 26 F.3d 728, 734-35 (7th Cir. 1994), citing *Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Wendt attempts to rely on the final policymaker prong of this test, claiming that Village President Vacco testified that he told Chief Evoy to make "necessary changes" to the department in response to Wendt's position but did not specify what changes to make. Wendt believes this directive ceded the Village's policymaking authority to Chief Evoy, rendering Evergreen Park liable for his personnel decisions. Wendt, however, oversimplifies any final policymaker analysis. A person's status as a final policymaker under § 1983 is a question of state or local law. *Pembaur* v. *City of Cinncinnati*, 475 U.S. 469, 483 (1986); *Kujawski* v. *Bd. of Comm'rs of Bartholomew County, Ind.*, 183 F.3d 734, 737 (7th Cir. 1999). The court must decide who has "authority to adopt rules for the conduct of government." *Auriemma* v. *Rice*, 957 F.2d 397, 401 (7th Cir. 1992). A final policymaker may delegate this authority, but this delegation must be the authority to set policy, not a mere delegation of final authority to make a decision. *Kujawski*, 183 F.3d at 739.

15

Wendt's evidence that Village President Vacco gave Chief Evoy the unreviewed discretion to "make necessary changes" to the department does nothing to illustrate that Evoy was given the power to make policy. If anything, Evoy was delegated final authority to make decisions concerning how the department should respond to Wendt's complaints, but no evidence is brought forth that this entailed a delegation to set policy for the department, or for that matter Evergreen Park. Moreover, Wendt fails to even address the issue of whether the Village President could have delegated policymaking authority to Wendt, as under local or state law, a Village Board, not its Mayor or President, may be the only entity entrusted with final policymaking authority. *See Auriemma*, 957 F.2d at 400. As such, no issue of fact exists to hold Evergreen Park liable and judgment is entered in its favor.

## CONCLUSION

For the reasons stated above, the court grants Evergreen Park's motion for summary judgment [#20]. The court does, however, also grant Wendt's motion for leave to file an amended complaint [#37]. Wendt is granted leave to file an amended complaint by March 3, 2003 based on actions that took place after his motion for summary judgment was filed and that are covered in his August 16, 2002 right to sue letter from the EEOC. The clerk is instructed to enter judgment in favor of Evergreen Park on Counts I, II, III, IV, and V of Wendt's Complaint.

ENTER: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: January 31, 2003